IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

VANESSA GILL,                          :
                                       :
    Petitioner,                        :   CIVIL ACTION NO. 13-00514-KD-B
                                       :
vs.                                    :
                                       :
    BOBBY BARRETT, *et al.*,           :
                                       :
        Respondents.                   :

## REPORT AND RECOMMENDATION

Vanessa Gill, a state inmate in the custody of Respondent Bobby Barrett, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Gill challenges the validity of her 2008 conviction in the Circuit Court of Dallas County, Alabama, for capital murder, for which she was sentenced to life in prison without the possibility of parole. (Doc. 7 at 3). This action was referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), S.D. Ala. GenLR 72(2)(R), and Rule 8 of the Rules Governing Section 2254 Cases. Following a thorough review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[1]

---

[1] Because Gill filed her federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which

Having carefully considered Gill's petition, Respondents' answer, and Gill's response, the undersigned finds that Gill's petition is due to be denied.  Accordingly, it is recommended that Gill's habeas petition be denied in its entirety and that judgment be entered in favor of Respondents and against Petitioner, Vanessa Gill, and that if Gill seeks the issuance of a certificate of appealability, her request be denied, along with any request to appeal *in forma pauperis*.

## I.    Findings of Fact and Procedural Background.

The Alabama Court of Criminal Appeals summarized the facts of this case as follows:[2]

> The State presented evidence that [Gill] and the victim were married.  It also presented evidence that, on March 24-25, 2006, the victim was severely beaten about his head and arms [and] that he died as a result of his injuries.

---

they are required." Kelley v. Sec'y for Dep't of Corrs., 377 F. 3d 1317, 1337 (11th Cir. 2004).  Gill has failed to establish that an evidentiary hearing is warranted in this case.  Birt v. Montgomery, 725 F.2d 587, 591 (11 th Cir. 1984) (en banc) ("The burden is on the petitioner . . . to establish the need for an evidentiary hearing.").

[2]    AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." Bui v. Haley, 321 F. 3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).  "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Id. (citing Sumner v. Mata, 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)).  These facts are recited in the unpublished memorandum opinion of the Alabama Court of Criminal Appeals on Gill's direct appeal of her trial and conviction.  See Gill v. State, CR-08-0512 (Ala. Crim. App. 2009)(Doc. 17-3).

Bill Wright testified that, on March 24-25, 2006, he was a deputy with the Dallas County Sheriff's Department and that he responded to a call at [Gill's] and the victim's residence.   As he approached the residence, he observed a white vehicle that did not have its headlights on quickly pulling out of a field that was beside the residence.   He contacted dispatch about that vehicle.

Wright testified that, when he arrived at the residence, he saw the victim on the ground approximately twenty feet from the garage of the residence.   He was bleeding heavily, primarily from his head, and was trying to speak, but was gurgling blood.   [Gill], who had made the emergency 911 telephone call, told him that the victim had been attacked by two or three people and that the people had run toward the front of the house, which was the opposite direction of the vehicle he had seen.

Although there was a lot of blood at the scene, Wright did not observe any on the appellant when he arrived.   He also testified that [Gill] was upset, but that, in retrospect, he would have expected her to be more upset under the circumstances.   Wright testified that [Gill] attempted to assist him in performing mouth-to-mouth resuscitation, but had to stop when something burned her lips.   Officers later found a white powder, which was lye drain cleaner, on and near the victim's body.

Deputies attempted to stop a white Pontiac Grand Prix on Highway 22, but the driver would not pull over.   After a high speed chase, during which several vehicles were hit, the vehicle stopped.   The driver, who was seen talking on a cellular telephone and identified as Curtis Cook, Jr., a nephew of [Gill], was the only person in the vehicle.

Officers found large amounts of blood, what appeared to be pieces of hair and scalp, and drain cleaner at the scene.   They also found $5,000 in cash in one of the victim's pockets and several hundred more in another pocket.   They did not find a shovel at the scene.

3

A search of Cook's vehicle revealed drops of what appeared to be blood on the armrest, two $100 bills, and a silver cellular telephone. In the trunk, officers found an aluminum baseball bat that had blood and pieces of flesh on it and a Halloween mask that had the white powder drain cleaner on it. Forensic testing revealed that blood on the baseball bat and on Cook's shirt matched the victim's blood.

Dr. Alfredo Paredes, a medical examiner employed by the Alabama Department of Forensic Sciences, performed the autopsy on the victim's body. He testified that it appeared that the victim had been hit at least six times in the face, on the top of the skull, and the side of his head with a blunt instrument. Parades also testified that the victim's face was covered with blood and was swollen and bluish black, that he had multiple crushing fractures on the top and base of the skull, and that his scalp and brain were severely bruised. Based on his examination, he concluded that the victim died as a result of multiple blunt force trauma. He further testified that the injuries could have been made by a baseball bat. Finally, he testified that the victim's body was covered with a white powdery substance that was caked on his arms and face with the blood and very difficult to remove.

Curtis Cook, Jr. testified that [Gill] is his aunt, that they were very close, and that she told him that the victim beat her up and cheated on her. He also testified that, at some point, [Gill] asked him to beat up the victim, break his legs, and throw lye in his eye to teach him a lesson for beating her up and cheating on her. Cook further testified that [Gill] wanted him to harm one of the victim's girlfriends. He testified that [Gill] said that she would make sure he was taken care of and that he took that to mean monetarily because he had indicated to her that he needed money. He also testified that [Gill] told him he would be compensated for helping her.

Cook testified that [Gill] telephoned him on his cellular telephone around 2:00 p.m. on March 24, 2006, and told him that was the day to beat up the victim. She telephoned him a second time within the next hour and told him to get prepared. They agreed that he

would drive to Selma and meet her in a parking lot and that they would get a hotel room.  After meeting and getting a hotel room, he followed her to the property that was beside her house and stayed in an area behind the house until [Gill] telephoned him to tell him they were going outside.

Cook testified that he took a baseball bat with him and that [Gill] gave him some lye.  She telephoned him several times during the evening and told him when to attack the victim.  Cook testified that, when the victim came out of the residence, he hit him with the baseball bat, that they fought and fell to the ground, that he straddled the victim and repeatedly hit him in the head, and that he threw lye in the victim's eye.  At some point, the appellant told him that that was enough and to get off of the victim.  He also testified that she asked him what he wanted, indicating money and handed him some money.  Finally, he testified that he then got into his vehicle and drove away, that law enforcement officers were following him, that he telephoned his wife, and that he finally stopped.

Cook admitted that he killed the victim, but stated that he did not intend to.  He stated that he attacked the victim because he wanted to help his aunt. Cook also admitted that he made a statement to law enforcement officers after he was arrested and stated that it was a drug deal gone bad and that the victim had come at him.  However, he explained that he did so in an effort to help himself and [Gill] and to keep from getting into trouble.  He also stated that they did not intend for the victim to die and that, after the fact, [Gill] told him not to tell anyone about it.

Odell Gill Jones, the victim's second cousin testified that she had a long telephone conversation with [Gill] less than one week before the victim was killed.  During that conversion, [Gill] said that the victim was a jealous person; that he was jealous of Cook; and that, if he ever hit her, she would have her brother beat him up.

Jones testified that, after the killing, [Gill] told her three men were there, that one was beating the victim with a bat, that she hit him with a shovel,

and that they threw a big pile of cocaine in his face. She also testified that no one would throw cocaine away. Jones testified that the appellant did not appear to be upset after the victim was killed. She further testified that, while they were visiting after the victim was killed, [Gill's] sister told her someone was in the Walmart parking lot waiting for her and that [Gill] said she would telephone them later. Finally, Jones testified that the appellant said, "[T]hey can't say I killed Marshall for his money because the deeds in Mama's name." (R. 422.)

Investigator Roy Freine of the Dallas County Sheriff's Department testified that she [sic] spoke to [Gill] at her house on the night of the murder. He testified as follows regarding her statement about the offense:

She, basically, told me that her husband was getting ready to go to Phoenix, Arizona. Initially, it was kind of shocking but she told me he was going to purchase drugs.

When they were getting ready to leave, that she went back inside and could hear her husband screaming and hear some commotion. And she went back outside and seen her husband being attacked by one guy with a stick or bat or something in his hand and she said she saw another guy at the corner of the house. And she got the phone and dialed 911, the guys fled.

(R. 467-68.)

Freine also spoke to Cook on the night of the murder. At first, Cook denied being there. Later, he stated that he and the victim got into a confrontation, that it had to do with drugs, that it was an accident, and that he did not mean to kill the victim. Subsequently, Cook stated that [Gill] was going to pay him to assault the victim.

Rachel Cook, Curtis Cook's wife, testified that Cook telephoned her around midnight on the night the victim was killed. At that time, he sounded scared and shocked and told her he had messed up. Afterward, he told her he might have killed someone, but that he did not mean to; that [Gill] had paid him $5,000 to go

to Selma and beat up the victim; that he needed the money; and that he and [Gill] had talked about it for a while and thought it was the best way to teach the victim a lesson because he had been cheating on her.

Rachel testified that [Gill] showed up at her house the next day and asked her not to say anything to anyone, that there would not be anyone to help Cook with his attorney if she went to jail, and that she did not mean for him to get caught. [Gill] also told her she would help with an attorney for Cook and that she would help her with the children. Rachel testified that [Gill] wanted to give her some money and arranged to meet her at Walmart, but [Gill] was not there. Instead, [Gill] telephoned her and told her that her sister's husband would meet her. He did meet her and gave Rachel $500 from [Gill].

Several defense witnesses testified on the [Gill's] behalf. Also, [Gill] testified on her own behalf and stated that she did not have anything to do with the death of the victim and that she did not ask Cook for assistance in that regard. She testified that, on the night of the murder, she talked to Cook on the telephone and agreed to loan him $100 to pay his rent. [Gill] testified that, later that night, she saw someone attacking the victim, that she grabbed a shovel, and that three people subsequently ran from their property.

[Gill] testified that she never suggested to Rachel that she was personally involved in the victim's death and that she did not offer Rachel money. She also testified that she did not give lye to Cook.

Gill v. State, CR-08-0512 (Ala. Crim. App. Oct. 30, 2009) (unpublished mem. op.) (Doc. 17-3 at 1-6).

Gill was indicted on August 30, 2006 for capital murder, in violation of § 13A-5-40(a)(7) of the Code of Alabama, for hiring her nephew, Curtis Cook, Jr., to beat up her husband for the sum of $5,000.00. (Doc. 7-1 at 13). She was re-indicted on October

17, 2006, in a two count indictment for capital murder and murder. The first indictment was quashed. (Id. at 14). Gill pleaded not guilty to the charges against her and was tried by a jury in December of 2008. (Id.). On December 15, 2008, Gill was convicted of capital murder in the Circuit Court of Dallas County, Alabama, and sentenced to life imprisonment without the possibility of parole. (Doc. 7 at 3).

Following her conviction, Gill sought a new trial based upon alleged jury tampering and the Government's alleged failure to reveal the existence of a leniency deal between the State and Cook. The trial court conducted a post-trial hearing on February 18, 2009, and denied the motion.(Doc. 7-1 at 889-915; see also, infra at subsection 5). On April 23, 2009, Gill appealed her conviction and sentence to the Alabama Court of Criminal Appeals. The Alabama Court of Criminal Appeals Court affirmed Gill's conviction and sentence in an unpublished memorandum opinion, Gill v. State, CR-08-0512 (Ala. Crim. App. Oct. 30, 2009) (mem. op.), and denied her application for rehearing. (Doc. 19 at 7). The Alabama Supreme Court denied Gill's petition for writ of certiorari and issued a certificate of judgment on September 10, 2010. Gill v. State, CR-08-0512 (Ala. Crim. App. Sept. 10, 2008) (Doc. 19 at 7).

On August 11, 2011, Gill filed a post-conviction Rule 32 petition with the trial court.(Doc. 7-1 at 1396-1405). The

petition was supplemented on August 22, 2011 (Id. at 1406-1418), and was amended on September 29, 2011 (Doc. 19 at 8).  On April 6, 2012, the trial court denied Gill's petition and amended petition as to each ground, and Gill again appealed.  (Doc. 7-1 at 1586-1643; 7-2).  The Alabama Court of Criminal Appeals affirmed the judgment of the trial court and Gill's application for rehearing was overruled.  Gill v. State, CR-11-1141 (Ala. Crim. App. Dec. 14, 2012) (mem. op.) (Doc. 19 at 8).  The Alabama Supreme Court denied Gill's petition for certiorari review, and a certificate of judgment of affirmance was issued on August 16, 2012.  (Id.).

Gill then filed the instant petition for federal habeas relief.[3]  In her petition, Gill lists seven grounds in support of her petition for habeas relief. (Doc. 7 at 1).  The petition has been fully briefed and is ripe for consideration. The Court will consider each of Gill's claims in turn.


## II.  Discussion.

Before addressing the merits of Gill's claims, the Court sets out the standard governing federal review of habeas claims. As noted supra, this Court's review of Gill's claims are governed by

---

[3]    Gill originally filed her petition in the United States District Court for the Middle District of Alabama, which is the district where she is currently imprisoned.  (Doc. 7 at 1; Doc. 17 at 5).  On October 23, 2013, the case was transferred to the Southern District of Alabama, which is the district where Gill was convicted and sentenced.(Id. at 14).

AEDPA. Under AEDPA, "the role of the federal court . . . is strictly limited." Jones v. Walker, 496 F.3d 1216, 1226 (11th Cir. 2007). Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.

Thus, a federal court may grant habeas relief only if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the way the United States Supreme Court did on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 404-405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); Price v. Vincent, 538 U.S. 634, 641, 123 S. Ct. 1848, 155 L. Ed. 2d 877 (2003)(a federal court will disturb

a state habeas court's decision on the merits only if the petitioner shows that the decision was contrary to, or involved an unreasonable application of, clearly established constitutional law as determined by the United States or if the decision rested upon an unreasonable factual determination.).  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Harrington v. Richter, 562 U.S. 86, 2013, 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011).  In other words, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. . . . [T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir. 2011); see also Greene v. Fisher, __ U.S. __ , 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011) (AEDPA standard is purposely onerous because "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction") (citations and internal quotation marks omitted); Cullen v. Pinholster, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011) (AEDPA standard "is a difficult to meet ... and highly deferential standard for evaluating state-court rulings, which demands that

state-court  decisions  be  given  the  benefit  of  the
doubt")(citations and internal quotation marks omitted).

Accordingly, in evaluating Gill's § 2254 petition, the Court
takes great care to abide by the stricture that "[a] federal court
may not grant habeas relief on a claim a state court has rejected
on the merits simply because the state court held a view different
from its own." Hill v. Humphrey, 662 F.3d 1335, 1355 (11th Cir.
2011); see also Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d
1277, 1286, 2012 U.S. App. LEXIS 6501 (11th Cir. 2012) ("This
inquiry is different from determining whether we would decide *de
novo* that the petitioner's claim had merit.").  Having established
the proper standard of review, the Court turns to Gill's claims.

**1.  Claim One.**

Gill asserts that her rights under the Fourteenth Amendment
were violated by the state court's unreasonable application of the
standard set forth in Jackson v. Virginia, 443 U.S. 307, 316, 99 S.
Ct. 2782 61 L. Ed. 2d 560 (1979).  According to Gill, the trial
court's denial of her motion for acquittal was improper given the
fact that Curtis admitted "that he committed the murder, and also
admitted that, the most he was authorized to do by defendant Vanessa
Gill was to assault the deceased victim."  (Doc. 7-1 at 14).
According to Gill, there was insufficient evidence that she had the
"particularized intent" to murder her husband, and no evidence was
presented that connected her directly to the murder.  (Id. at 17-

12

21).   Respondents counter that this claim was raised in the state courts and properly denied on the merits.   (Doc. 17 at 6).

The Fourteenth Amendment's due process guarantee assures that no criminal conviction shall stand "except upon sufficient proof--defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787, 2789, 61 L. Ed. 2d 560 (1979).   "In assessing the sufficiency of the evidence to support a state court conviction in a habeas proceeding, the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". Erwin v. Secretary, Florida Department of Corrections, 568 Fed. Appx. 749, 751 (llth Cir. 2014)(citing Jackson, 443 U.S. 307, 319). The court reviews the essential elements of the crime as defined by state law to determine whether the essential elements of the crime as defined by state law have been meet. Erwin, 568 Fed. Appx. at 751.

In Alabama, one who hires another to commit a murder may be convicted of the capital murder offense delineated in §13A-5-40(a)(7), Code of Alabama, under the theory of accomplice liability. §13A-5-40(a)(7) requires (1) proof of an intentional murder and (2) proof that the murder was committed for pecuniary

gain, or pursuant to a contract, or for hire. Ex parte Woodall, 730 So.2d 652, 658 (Ala. 1998).   Under this theory, "[t]he accomplice. . .is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed," but [the defendant] is not responsible for any special act, not within the scope of the common purpose, but growing out of the individual malice of the perpetrator. Id. at 658. (the Alabama Supreme Court held that evidence presented at trial was sufficient to support the defendant's capital murder conviction in connection with the murder of his mother where the state presented evidence that the defendant had hired someone to kill his brother and had advised him that his sister might be visiting, and if necessary, would need to be dealt with, and that the Defendant knew his mother resided at the residence and would likely be present.);see also Burton v. Campbell, 2009 U.S. Dist. LEXIS 133679 (N.D. Ala. Mar. 27, 2009)(although the defendant was not the actual person to pull the trigger, he had the requisite intent to sustain the murder conviction where there was evidence that he was the one who planned the robbery and he took weapons to the robbery site).

In this case, the Alabama Court of Criminal Appeals rejected Gill's sufficiency argument, and stated, in part, that:

> The appellant argues that the State did not present
> sufficient evidence to support her conviction for
> capital murder.   Specifically, she appears to contend

14

that the State did not establish that she had the particularized intent that the victim be killed.

The appellant was charged with committing murder for hire. See § 13A-5-40(a)(7), Ala. Code 1975.

"The following are capital offenses:

"...

"(7) Murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire."

§ 13A-5-40(a), Ala. Code 1975.

A defendant who does not personally commit act of killing which constitutes the murder is not guilty of a capital offense defined in subsection (a) of this section unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of Section13A-2-23, in addition to being guilty of the other elements of the capital offense as defined in subsection (a) of this section.

Also, § 13A-5-40(c), Ala. Code 1975.

. . .

At trial, the State proceeded under an accomplice liability theory. Alabama's accomplice liability statute provides:

"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:

"...

"(2) He aids or abets such other person in committing the offense. . ."

§ 13A-2-23, Ala. Code 1975.

15

"The words 'aid and abet' encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary. Wright [v. State], 494 So.2d 936 (Ala. Crim. App. 1986); Sanders v. State, 423 So.2d 348 (Ala. Cr. App. 1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. 'The jury is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented.' Walls v. State, 378 So.2d 1186, 1191 (Ala. Cr. App. 1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala. 1980). Such facts as the defendant's presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred."

Henry v. State, 555 So.2d 768, 769 (Ala. Crim. App. 1989)

.. . . .

"'[w]here the evidence is conflicting as to the defendant's connection as an accomplice or co-conspirator, a jury question is presented.' Sanders v. State,[423 So.2d 348 (Ala. Crim. App. 1982), citing Watkins v. State, 357 So. 2d 156, 160 (Ala. Crim. App. 1977), cert. denied, 357 So.2d 161 ([Ala.]1978)."

Henry, 555 So.2d at 770.

. . ."'"The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala. Crim. App. 1984); Craig v. State, 410 So.2d 449 (Ala. Crim. App. 1981), cert. denied, 410 So.2d 449 (Ala. 1982). Loper v. State, 469 So.2d 707, 710 (Ala. Cr. App. 1985). "Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to accomplish the probable and natural results of his act, in the absence

> of proof to the contrary." <u>Snipes v. State</u>, 364
> So.2d 424, 426 (Ala. Cr. App. 1978).'
>
> "<u>Oryang v. State</u>, 624 So.2d 989, 994 (Ala. Cr.
> App. 1994)."

<u>Wilson v. State</u>, 777 So. 2d 856, 932-33 (Ala. Crim.
App. 1999).

> "Pulling the trigger is only one factor in
> determining intent to kill. <u>Ritter v. State</u>, 375
> So.2d 270, 274-275 (Ala. 1979). From the
> testimony concerning the defendant's words and
> actions during the course of the robbery, the
> jury had sufficient evidence from which to infer
> that the defendant was prepared to kill, intended
> to kill and supported Watkins in his killing of
> Mr. Mayfield and, thus, that the defendant was an
> accomplice to the intentional killing [the
> victim]."

<u>Ex parte Raines</u>, 429 So.2d 1111, 1113 (Ala. 1982).
Finally, "'[w]hether a non-triggerman aided and
abetted the actual killing itself, such as by being
present to render assistance in the killing itself if
it becomes necessary, will almost always be a jury
question.'" <u>Gamble v. State</u>, 791 S.2d 409, 445 (Ala.
Crim. App. 2000).

> Based on the evidence set forth in detail above,
> the jury could have reasonably concluded from the
> weapon used and the nature of the assault, the fact
> that the appellant waited so long into the attack to
> tell Cook to stop, the appellant's actions and
> reactions to the killing, and the self-serving nature
> of Cook's statements that the appellant intended for
> Cook to kill the victim. Accordingly, her argument to
> the contrary is without merit.

(Doc. 17-3 at 6-13.)

Applying § 2254 and the presumption of correctness that

attaches to the state courts' factual findings, this court cannot

say that Gill is entitled to habeas relief on this issue. Gill

has not shown, pursuant to § 2254 (d), that the decisions of the state courts were contrary to or involved an unreasonable application of clearly established federal law or that the decision of the Alabama courts were based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. While Gill contends that there was no evidence of a planned scheme to murder her husband, and that her alleged accomplice (Cook) told investigators and later testified at trial that Gill asked him to beat up her husband and break his legs, not kill him, the undersigned finds that the jury had before it evidence that, if believed, warranted the rejection of Gill's contention that there was no evidence of an intent to kill.

As found by the appellate court, there was sufficient evidence, including testimony regarding the type of weapon used (*i.e.,* baseball bat), and the severity of injuries sustained by the victim, upon which to convict Gill [4]. Indeed, multiple witnesses described the brutal injuries that led to the victim's death. For instance, the forensic pathologist testified that the

---

[4] While Gill argues there is no direct proof of her intent to kill her husband, the appellate court correctly found that circumstantial evidence is sufficient as long as the jury believes beyond a reasonable doubt the defendant is guilty. See Edwards v. State, 139 So. 3d 827, 836 (Ala. Crim. App. March 29, 2013) (quoting White v. State, 314 So. 2d 857 (Ala. 1975), cert. denied, 423 U.S. 951 (1975) ("'Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.'")).

victim "died as a result of multiple blunt force injuries" to the face, side of the head, and top of the skull, which were consistent with a bat, but he "had no injuries from the neck down." (Doc. 7-1 at 400-01). Moreover, Investigator Mike Grantham testified that he found the victim's scalp flesh located "as far away as 20 feet" from the victim's body, leading him to opine that the "blows. . .used to cause this trauma was [sic] so significant, that once the flesh was torn from the body it actually flew that far." (Id. at 331-32). The fact that the victim did not sustain any injuries below the neck and that flesh from his head was located as far as 20 feet from his body conflicts with Cook's testimony that there was no intent to kill the victim, and that Gill only requested that he beat up her husband and break his legs in order to teach him a lesson.  Moreover, there was testimony that Gill was present and stood by and watched as Cook delivered a number of blows to the victim's head area before finally intervening. This evidence, along with testimony that Gill orchestrated Cook's encounter with her husband on the night of the brutal attack, that notwithstanding the brutal beating endured by her husband, Gill had no blood on her when authorities arrived, that Gill's demeanor and lack of emotion in the hours and days following the incident were not consistent with that expected of someone who had recently witnessed the brutal beating of her

husband [5], and that Gill offered payment to Cook's wife in an effort to silence her regarding Cook's involvement in the victim's death, further supports the appellate court's finding. Accordingly, based upon the evidence presented, the undersigned finds that a rational finder of fact could have, by fair inference, found that Gill intended that her husband be killed, that Gill enlisted Cook to carry out the killing, that she helped to facilitate the killing, and that her husband was killed "for a pecuniary or other valuable consideration or pursuant to a contract or for hire". The fact that the jury could have drawn contrary inferences favoring Gill based on the same evidence is of no moment because habeas relief is only proper 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.' See Morton v. Sec'y, Dep't of Corr., 684 F.3d 1157, 1166 (11th Cir. 2012) ("[W]e may issue a writ of habeas corpus only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'") (citations omitted.).

---

[5] Sheriff's Deputy Bill Wright testified that in retrospect, he would have expected Gill to be more "upset" (id. at 290, 295); Likewise, Investigator Mike Grantham testified that he "had never been to a crime scene that is this horrendous where they were calm. . ."(id. at 392), and Odell Jones, the victim's cousin, stated that she expected Gill to be more upset, but instead, Gill just told the story of her husband's death "so eas[ily]." (Id. at 528).

   2.   **Claim Two.**

   Gill claims that the trial court "so infected the trial with unfairness as to make the resulting conviction a denial of due process" when it responded erroneously to a question from the jury.  (Doc. 7-1 at 27).  Specifically, Gill argues that in responding to a question from the jury, the trial court stated that the case "involved" complicity rather that stating the case "allegedly involved" complicity.  (Id.).  Gill presented this claim to the Alabama Court of Criminal Appeals on direct appeal, and in its memorandum rejecting Gill's claim, the court stated:

> We have reviewed the trial court's oral charge and its supplemental instructions in response to the jury's question.  Taken in context of the entire charge, we do not believe a trial court was stating as a fact that the case involved complicity.  Rather, we find that the instructions, taken as a whole, were sufficient to inform the jury that it was its duty to determine whether the appellant was complicit in Cook's actions.  Therefore we do not find that there was any reversible error in this regard.

(Doc. 17-3 at 14).

   This claim involves the interpretation and application of state law by state courts.  Federal review of the propriety of jury instructions from a state trial is very limited.  See Agan v. Vaughn, 119 F. 3d 1538, 1545 (11th Cir. 1997) ("Our limited role on habeas review, when faced with a challenge to a state law jury charge, is to determine whether any error or omission in the jury charge was so prejudicial as to amount to a violation of due

process.") (citing <u>Carrizales v. Wainwright</u>, 699 F. 2d 1053, 1055
(11th Cir. 1983).  "A defendant's right to due process is not
violated unless an erroneous instruction, when viewed in light of
the entire trial, was so misleading as to make the trial unfair."
<u>Id</u>.

Upon review of the record, the undersigned finds that the
trial court originally instructed the jury regarding the law of
complicity by charging:

> . . . [T]here is an element of law called complicity
> which means a person is legally accountable for the
> behavior of another person constituting a crime if,
> with intent to promote or assist in the commission of
> a crime, she either procures, induces, or causes such
> other person to commit the crime or aides or abets
> such other person in committing the crime.  That
> complicity charge would apply to the Count Two which
> is the murder charge in this case.

(Doc. 7-1 at 848).  Later, in response to a second question from
the jury regarding the element of intent as it relates to capital
murder, the trial judge restated the entirety of his original
charge regarding the elements of capital murder and intentional
murder, and instructed the jury as follows:

> *This case involves complicity*.  Basically, I'm going to
> give you the law on complicity again.  A person is legally
> accountable for the behavior of another person constituting
> a crime if with intent to promote or assist in the
> commission of a crime she either procures, induces, or
> causes such other person to commit the crime, or aides or
> abets such other person in committing the crime.
>
> So basically, if you find that the defendant procured,
> induced, or caused Curtis Cook to commit the crime or
> either aided and abetted Curtis Cook in committing the

crime, then she would be guilty for his actions.
(Doc. 7-1 at 857) (emphasis added).

Having reviewed the record, the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err with respect to its reinstruction on the issue of complicity. The record reflects that in response to a second question from the jury regarding intent, the court misspoke when it stated that the case "involved complicity," before proceeding to give the jury the charge on "complicity" again. There is no allegation that the instruction on "complicity" was incorrect, and the record reflects that the Court made clear that Gill could only be found guilty under a complicity theory *if* the jury found that she procured, induced or caused Curtis Cook to commit the crime. (Doc. 7-1 at 857). In the trial, the prosecution never alleged or sought to prove that Gill personally held a weapon and fatally struck her husband; rather, the State attempted to prove that Gill caused the demise of her husband by contracting with Cook, and helping to facilitate her husband's death. Thus, it was appropriate for the trial court to instruct the jury on complicity, and taking the jury instructions as a whole, the undersigned finds that Gill has failed to show that the trial court's omission of the word "alleged" when referring to "complicity" rendered her trial fundamentally unfair. Indeed, no reasonable fact finder could

have understood the instruction that "this case involved complicity" to be a fact of the case. Thus, Gill has failed to state a cognizable federal habeas claim.

### 3. Claim Three.

In claim three, Gill asserts that her Fourteenth Amendment rights were violated by the trial court's admission of gruesome and inflammatory photographs of the victim's body, post-mortem, at the crime scene. (Doc. 7-1 at 29). As noted by the Respondent, while Gill challenged the trial court's admission of this evidence on direct appeal, she did not argue that the admission violated these constitutional provisions. The claim was presented merely as one of state law, based on potential undue prejudice, irrelevance, and abuse of discretion for the trial court to hold them admissible. (Doc. 17-2 at 47-52). Because Gill did not fairly present this claim to the state courts and alert them to the federal nature of her claim, the claim is procedurally barred[6]. See Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998)("Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in

---

[6] The doctrine of procedural default provides that '[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." Smith v. Jones, 256 F. 3d 1135, 1138 (llth Cir. 2001).

order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'").

Assuming *arguendo* that the claim was not procedurally defaulted, Gill has not established that she is entitled to habeas relief on this claim.  In response to Gill's assertion, on direct appeal, that she was unfairly prejudiced by the introduction of the photographs, the Alabama Court of Appeals, in its memorandum opinion rejecting her claim, stated, in part, that:

> We have reviewed the photographic evidence in this case, and we find that it was neither unduly prejudicial nor inflammatory.  Rather, the evidence was relevant to depict the nature and extent of the injuries the victim suffered and the crime scene and made it possible for the jury to view them, to corroborate Cook's testimony about the murder, and to aid in presenting other testimony about the victim's body and the crime scene.  Therefore, the trial court did not err in admitting the photographic evidence.

(Doc. 17-3 at 16).  Claim three involves the interpretation and application of state law by state courts.  Thus, as with the state law issues discussed above, the issue of whether the trial court erred in admitting these photographs will be reviewed on federal habeas only to determine whether the alleged state trial error was "material in the sense of a crucial, critical, highly significant factor," Shaw v. Boney, 695 F. 2d 528, 530 (11th Cir. 1983), and rendered "the entire trial fundamentally unfair." Carrizales, 699 F. 2d at 1055; see also Smith v. Newsome, 876 F. 2d 1461, 1468 n.8 (11th Cir. 1989)("Federal courts reviewing habeas corpus petitions

are not empowered to correct erroneous evidence rulings of state trial courts.")

> "Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" Bankhead v. State, 585 So. 2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So. 2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154 (Ala. 1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So. 2d 368, 371 (Ala. Crim. App. 1986) (citations omitted). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So. 2d 780, 784 (Ala. 1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' Ferguson v. State, 814 So. 2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So. 2d 970 (Ala. 2001). "'[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.'" Jackson v. State, 791 So. 2d 979, 1016 (Ala. Crim. App. 2000), quoting Perkins v. State, 808 So. 2d 1041, 1108 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002), on remand to, 851 So. 2d 453 (Ala. 2002)."

McCray v. State, 88 So. 3d 1, 63-64 (Ala. Crim. App. 2010) (quoting Brooks v. State, 973 So. 2d 380, 393 (Ala. Crim. App. 2007).

Having reviewed a description of the photographs at issue through the testimony at trial, the State of Alabama's exhibit list (Doc. 7-2 at 115-16), and the attached photographs (*id*. at 183-94), the Court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err in admitting photographs of the crime scene, including photographs of the victim's body and gruesome wounds.  While Gill argues that the photographs did not 'bear upon a relevant issue in the case such as motive, opportunity, or knowledge' (Doc. 19 at 24-25) (emphasis omitted) (quoting Huddleston v. United States, 485 U.S. 681, 685 (1988)), the Court disagrees.  The photographs not only corroborated the testimony of the forensic pathologist and Cook, they also bore on the severity of the  attack, and thus the issue of whether the victim's death was intentional, as well as motive, opportunity and knowledge.  Furthermore, assuming *arguendo* that the trial court did err with respect to the admission of the photographs, Gill has not demonstrated how their admission adversely affected her trial so as to render the entire trial fundamentally unfair.  Indeed, the testimony of Cook, his wife, and the forensic pathologist provided strong evidence against Gill such that even if the photographs were erroneously admitted, they did not render the trial fundamentally unfair.  Thus, Gill fails to state a cognizable federal habeas claim.  Jacobs v. Singletary, 952 F.2d 1282, 1296

(11th Cir. 1992)("The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair.")(internal citations and punctuation omitted.)

### 4. Claim Four.

Gill claims her right to due process was violated when she was denied a fair trial due to jury tampering because Kathy Harris, a prosecution supporter, was seen talking to "a couple of jurors" (Doc. 7-1 at 359), and the trial court failed to conduct a hearing to identify and evaluate possible juror bias[7].

The record reflects that during the trial, it was brought to the court's attention that possible jury tampering had occurred. Specifically, the court was notified that Kathy Harris, a spectator, was seen talking to jurors. Gill's counsel requested that the court question Ms. Harris regarding the allegation. (Doc. 7-1 at 360). During a lunch recess outside the presence of the jury, the court questioned Ms. Harris as follows:

THE COURT:    What's your name?

_____

[7] Here again, it does not appear that Gill presented this as a federal claim to the state courts. She instead argued that supporters of the prosecution tampered with the jury and that the trial court did not adequately investigate the allegations. On direct appeal, the Alabama Court of Criminal Appeals held that because Gill's counsel did not object to the trial court's handling of the jury tampering allegation at trial, the issue was not preserved for appellate review. (Doc. 17-2 at 53-57). The court nevertheless addressed the merits of the claim and held that Gill had not made a sufficient showing that the jury was biased against her. The undersigned finds that assuming arguendo that this claim was not procedurally defaulted, it fails on the merits. (Doc. 17-3 at 16-18).

SPECTATOR:      Kathy Harris.

THE COURT:      Somebody said they thought you might have been talking to a juror in the hall.

SPECTATOR:      No, I hadn't talked to any jurors.  Honestly, I didn't.

THE COURT:      That's fine.

MS. LYNCH:      Do we need to find out who she is for the record?  I don't know if she's related to the case.

MR. OXFORD:     She's married - -

MR. MCPHILLIPS: She's married to one of the brothers of Marshall Gill [the victim].

THE COURT:      I thought all his family was on your side?

MR. MCPHILLIPS: I thought so too.

THE COURT:      I think the jury will let me know if something happens.

MR. MCPHILLIPS: Your Honor, there are a bunch of half brothers I don't know about.

(Id. at 414).

Gill's counsel did not object to the court's handling of the jury tampering issue and did not pursue the issue any further until *after* the jury returned its guilty verdict.  At that point, Gill's counsel moved for a mistrial based, *inter alia*, on jury tampering.[8]

---

[8]     After the jury returned its verdict, Gill, through her attorney, moved for a mistrial on the basis of all previous noted objections, particularly that a "Ms. Harris (a family member friendly to the prosecution) was seen and overheard talking with

During a post-trial hearing on Gill's request for a new trial, conducted on February 18, 2009, Gill's counsel again raised the allegation of jury tampering. Prior to the hearing, Gill's counsel had filed a motion to have all 12 jurors subpoenaed to testify at the hearing as to possible jury contamination. While the motion was pending, Gill's counsel subpoenaed the jurors from the trial. When the trial court learned of the subpoenas on the morning of the hearing, all of the jurors were released because Gill's counsel had not received permission from the court to subpoena the jurors, and because the trial court determined that Gill had not made a threshold showing which warranted compelling the jurors to testify. (Doc. 7-1 at 41; 877-78).

At the hearing, Asberry Gill [the victim's brother] and Wanda Steele [Gill's sister], both testified that they observed Ms. Harris talking with a member of the jury. (Doc. 7-1 at 874-77; 882-87). They also testified that they did not "actually hear what [Ms. Harris] said" to the juror, (id. at 876-77; 884). According to Mr. Asberry, he approached Ms. Harris as she sat speaking with a juror and Ms. Harris introduced him to the juror

---

members of the jury." (Doc. 7-1 at 40). Defense counsel argued as follows:

> We also think that there were some people talked to among some of the jurors by someone the other side although we are not sure who they were. We brought that information to you earlier on.

Id.

and he too "spoke to [the juror]." (Id. at 886-87).  Following the

testimony, the trial court found "no grounds to either grant a new

trial or to set aside the verdict" and denied Gill's motion.  (Id.

at  915).

As noted *supra*, Gill argued on direct appeal that supporters

of the prosecution tampered with the jury and that the trial court

failed to adequately investigate the claims. (Doc. 17-3 at 17);

The Alabama Court of Criminal Appeals, in its memorandum rejecting

Gill's claim, stated:

> As soon as the allegations of jury tampering were
> brought to its attention, the trial court investigated
> the allegations and questioned the person who had been
> accused of tampering with jurors and satisfied itself
> that no such tampering had occurred.  The appellant
> did not object to the trial courts method of handling
> the allegations concerning Harris, and she did not
> request any further investigation when the alleged
> tampering was made known.  See Watson v. State, 439
> So. 2d 762, 769 (Ala. Crim. App. 1983) (holding that,
> "[t]o be timely, an objection must be interposed as
> soon as the ground for the objection becomes
> apparent").  Also, although the appellant raised this
> argument again in her motion for a new trial, that
> motion was not sufficient to preserve this issue for
> our review.  See Hamrick v. State, 548 So. 2d 652
> (Ala. Crim. App. 1989) (holding that, absent a timely
> and sufficient objection at trial, a post-trial motion
> will not preserve an issue for appellate review).
>
> Moreover, the people who witnessed the alleged
> jury tampering admitted that they did not know what
> was said.  Nevertheless, they made the conclusory
> allegation that Harris's [sic] actions prejudiced or
> might have prejudiced the jurors against the
> appellant. Without more than the mere allegation of
> exposure to some speculative outside influence, the
> appellant has not made sufficient allegations to
> support a conclusion that, even if Harris had been

speaking to one of the jurors, the jury might have been prejudiced against her. See Ex parte Apicella, 809 So. 2d 865 (Ala. 2001).

(Doc. 17-3 at 17-18).

In her petition before this court, Gill contends that she was denied a fair trial due to "contamination by extraneous influence", and by the trial court's failure to conduct a hearing to investigate the jury tampering claim. The Sixth Amendment, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects a criminal defendant's right to a fair trial by a panel of impartial jurors. Parker v. Gladden, 385 U.S. 363, 364, 87 S. Ct. 468, 470, 17 L. Ed. 2d 420. (1966). Integral to this right is the requirement that a jury base its verdict on the evidence presented at trial. See Turner v. State of Louisiana, 379 U.S. 466, 472, 85 S. Ct. 546, 549, 13 L. Ed. 2d 424 (1965); Irvin v. Dowd, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L.Ed. 2d 751 (19610(To be impartial, a juror must base his or her decision on the evidence presented in the case.).

"In any trial, there is initially a presumption of jury impartiality; prejudice will not be presumed, but can be demonstrated by a defendant by a preponderance of credible evidence." United States v. Winkle, 587 F.2d 705, 714 (5th Cir.), cert. denied, 444 U.S. 827, 100 S. Ct. 51, 62 L. Ed. 2d 34 (1979) (citations omitted). "Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations; any

'prejudicial factual intrusion' denies a defendant [her] rights to trial by an impartial jury and to challenge the facts adverse to [her] that are made known to the jury." Id. (quoting United States v. Howard, 506 F.2d 865, 866 (5th Cir. 1975); Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954)). In Remmer, the Supreme Court explained:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial *about the matter pending before the jury* is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of know rules of the court and the instructions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer, 347 U.S. at 229 (emphasis added).

It is only when the defendant has made a colorable showing of extrinsic influence that the court must investigate the asserted impropriety. United States v. Ayarza-Garcia, 819 F.2d 1043, 1051 (11th Cir. 1987). Such a colorable showing must consist of evidence that is "clear, strong, substantial and incontrovertible ..." United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990) (citing United States v. Barshov, 733 F. 2d 842, 851 (11th Cir. 1984)). "Cases dealing with the degree of investigation required fall along a continuum focusing on two factors: the certainty that some impropriety has occurred and the seriousness of the

accusation." Ayarza-Garcia, 819 F.2d at 1051 (citations omitted). "The more speculative or unsubstantiated the allegation of misconduct, the less burden there is to investigate; the more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." Id.

As found by the appellate court on direct appeal, the trial court acted promptly when Gill's counsel reported alleged jury tampering during Gill's trial.  The trial court questioned Ms. Harris, who was married to one of the victim's brothers, and who was alleged to be friendly towards the prosecution.  Ms. Harris denied any contact with the jurors, and no juror reported any such contact to the court.  In light of the fact that Gill's counsel did not request that any further action be taken, and the fact that the allegation was not substantiated during trial, the trial court's investigation was reasonable under the circumstances.

While Gill's counsel presented two witnesses at the post trial hearing, who testified that they observed Ms. Harris speaking to one or more unidentified jurors, there was no evidence, let alone any assertion, that the alleged discussions related to a matter pending before the jury.  Both witnesses testified that they did not hear what Ms. Harris said to the jurors.  Additionally, while one of the witnesses, Mr. Asbury Gill, testified that Ms. Harris introduced him to one of the

34

jurors, he did not identify the juror to whom he was purportedly introduced, nor did allege that there was any discussion regarding the case during the brief introduction.[9]  In the absence of any evidence that Ms. Harris sought to speak with any of the jurors about the case, or did in fact speak to them about the case, the trial court concluded that Gill had not made a threshold showing. Likewise, on direct appeal, the Alabama Court of Appeals concluded that "[w]ithout more than the mere allegation of exposure to some speculative outside influence, the appellant has not made sufficient allegations to support a conclusion that, even if Harris had been talking to one of the jurors, the jury might have been prejudiced against her." (Doc. 17-3 at 18.).  Gill has not demonstrated that her right to a fair trial was violated due to any improper contact with the jury.  The state courts made specific findings that the trial court inquired about the alleged improper contact, and determined that there was no evidence of extrinsic communications with the jury about the case. Gill has not overcome the presumption of correctness afforded to these findings. 28 U.S.C. § 2254(e).  She has failed to show that the

---

[9] Additionally, there is nothing in the record that suggests that Ms. Harris was actually friendly towards the prosecution.   The court transcript reflects that Ms. Harris was married to one of the half brothers of the deceased,  and Mr. Asbury Gill was the brother of the deceased.  While Mr. Asbury Gill was a witness for the defense, there is nothing reflecting that Ms. Harris offered any testimony in the case or that she was in fact friendly towards the prosecution.

state court's finding regarding her jury tampering claim was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts. Thus, Gill is not entitled to habeas relief on this claim[10].

**Claims Five and Seven.**

In claim five, Gill asserts that her right to Due Process was violated because the State failed to disclose the deal that it made with Cook, the main witness against Gill, in exchange for his testimony against her. Gill contends that the State's misconduct violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In claim seven, Gill makes a related argument in that she contends that she was denied a fair trial because the State "deliberately" withheld the fact that Cook, their main witness, lied on the witness stand when he testified under oath that he had not received leniency from the prosecution in exchange for his testimony. In support of her claims, Gill points to the fact that while Cook testified that he had not been offered a plea agreement nor a promise of leniency, following Gill's conviction,

---

[10] In her brief, Gill asserts that following the trial, her counsel presented the affidavit of Ms. JoAnn Hurt, who was dismissed from the jury before deliberations due to health problems. Ms. Hurt did not report any contact with Ms. Harris. Ms. Hurt instead reported that before the trial, she heard several jurors state that they knew that Gill was guilty. However, there is nothing in the record indicating that Ms. Hurt ever identified the jurors who made the purported statements.

he was permitted to pled guilty and was sentenced to 25 years to life, which means that unlike Gill, he is eligible for parole.

Gill also relies on an affidavit that Cook provided after his sentencing, and nearly two years after Gill's trial, in which he recanted his trial testimony and asserted that his counsel and counsel for the prosecution had coached him to give false testimony against Gill.  According to Cook, the prosecutors and his attorney met with him multiple times to discuss his testimony, and he was given a type written timeline with dates, times and facts that they wanted him to testify to although the information conflicted with his personal knowledge.  Cook stated that 85% of his testimony was based on information provided by the prosecutors and his counsel, and that it was clear to him that in return for testifying "their way", he would receive leniency. (Doc. 7-1 at 85-87).

The record reflects that during Gill's trial, Cook was questioned extensively regarding the existence of any plea agreement or promise or offer of leniency, and he repeatedly denied that any agreement or offer had been made. Cook testified as follows:

[PROSECUTOR:]  Why are you testifying today, Curtis?

[COOK:]  Because it's the right thing to do.  And I promise the Lord, you know, I would do what's right.  And I told my mom and dad I would do what's right.

[PROSECUTOR:]  Okay, Let me ask you this:   Has anybody - -
me, your lawyer, anybody - - said that you were going to get
anything out of this?

[COOK:]   No, ma'am.


. . .

[DEFENSE COUNSEL:]  . . . And Miss Lynch brought out the fact
that you're not seeking anything to gain, no deal, et
certera?

[COOK:]      No, sir.

[DEFENSE COUNSEL:]  But you certainly do expect, do you not,
from this testimony at least to get something out of it?
That's your hope isn't it?

[COOK:]   No, sir.  I wanted to get myself right with God.

[DEFENSE COUNSEL:]  Well, you know, you have been indicted
for and due to be tried later for capital murder are you not?

[COOK:]   Yes, sir.

[DEFENSE COUNSEL:]  And you know what the severe consequences
are for capital murder?   There are generally two different
possibilities if convicted?

[COOK:]   Right, yes, sir.

[DEFENSE COUNSEL:]  Right.  And you are trying to avoid one
of those or both of those possibilities, aren't you?

[COOK:]   No, sir.

[DEFENSE COUNSEL:]  Yes, sir.  And you know, with all due
respect, I know you have a fine, excellent attorney over
here, Bruce Maddox.  No question about it he's one of the
best criminal defense lawyers around.  But you are aware that
your attorney has certainly been conferring with the district
attorney's office back and forth throughout this trial - -

[COOK:]   True

[DEFENSE COUNSEL:]  - - and the days before this trial
haven't you?

[COOK:]   Yes, sir.

[DEFENSE COUNSEL:]  And with all due respect, you know, with
the help and assistance from your family, you have obviously
made arrangements to take care of Mr. Maddox, have you not?
To your knowledge, he's not doing it for free, is he?

. . .


[DEFENSE COUNSEL:]  Well, although you say there's no deal
been promised and I heard that from you and from the district
attorney's office.  But at the same time, you certainly
expect, after your time here on the stand, that you will get
some consideration one way or the other out of it don't you
or hope that don't you?

[COOK:]   I'm not expecting anything sir.

. . .

(Doc. 7-1 at 457; 466-67).

Following her conviction, Gill sought a new trial, and in
preparation for a  hearing on her motion, Gill's counsel issued
subpoenas to Cook's counsel, Bruce Maddox, the deputy district
attorney, Shannon Lynch, and the district attorney, Michael
Jackson, in attempt to have them testify under oath as to whether
or not any deal for leniency had been made between Cook and the
State.  At the hearing, the attorneys objected to the subpeoneas,
and the trial court sustained their objections. (Id. at 907-910).
The  trial  circuit  court  explained  that  "[t]he  attorneys  have
throughout  this  case  consistently  said  there  is  no  deal.   They
told  me  that  as  an  officer  of  the  court.   I  am  not  going  to

subject them to taking the stand to testify about it. . . .
Unless you[, Petitioner,] have something that shows they lied to
me." (Doc. 7-1 at 889-915).

Gill's counsel then sought to question Cook's parents
regarding their knowledge of any deal that Cook has made with the
State for leniency in exchange for his testimony. Both of Cook's
parents took the stand and denied any knowledge of or being privy
to any deal between Cook and the State. (Doc. 7-1 at 897-900).
Based on the record before it, the trial court denied Gill's
motion to set aside the verdict or grant a new trial. (Id. at
914-15).

On direct appeal to the Alabama Court of Criminal Appeals,
the appeals court rejected Gill's claim that the prosecution
attorneys failed to reveal the deal, and observed:

> During the hearing on the motion for a new trial, the
> trial court stated that the attorneys had consistently
> stated, as officers of the court, that there was not a
> deal. It also stated that it was satisfied with those
> representation, but that it would consider evidence that
> showed that the attorneys had lied. The defense did not
> present any such evidence. Instead, it simply continued
> to make the unsupported allegation that Cook must have
> made a deal in exchange for his testimony. Because the
> attorneys and Cook repeatedly assured the trial court
> that there was not a deal and because the appellant made
> only speculative assertions to the contrary, we do not
> find that there was any error in this regard.

(Doc. 17-3 at 20-21).

Later, Gill filed a Rule 32 petition in which she again
alleged that the state had failed to disclose a plea agreement

with Cook, and that juror misconduct violated her right to due process. Subsequent thereto, she supplemented her petition and alleged newly discovered evidence in the form of the affidavit of Cook [11]. As noted *supra*, in the affidavit, Cook recanted his testimony implicating Gill, and asserted that it was clear to him that in exchange for giving testimony favorable to the prosecution, he would receive leniency. In lieu of an evidentiary hearing, the Court directed the parties to submit affidavits, interrogatories or depositions. (Doc. 17-10 at 5-6).   The State

---

[11] Cook's affidavit included assertions that:

> The DA Sharon Lynch and my attorney Bruce Maddox both met with me, with all of us discussing what I was supposed to say in the same room.  We met like this multiple times, in the front conference room of the Dallas County Jail, on at least three times.  At one point, I was even given a type written timeline with times and dates on one side, and the facts they wanted me to say on the other.  These were all different from how I wanted to testify and were not my personal knowledge.  I was told to memorize this time line for my testimony against Vanessa Gill.  This time line of theirs ended up being 85% of my testimony at trial.  I was told by my attorney, Brue Maddox, at the time, to "get rid of this piece of paper," meaning the timeline. The guards at the Dallas County Jail witnessed these meetings and can testify to the same.

> It was clear to me that in return for memorizing their timeline and testifying their way, that I would receive leniency.

> Vanessa Gill did <u>not</u> ask me to harm Marshall Gill in any way what so ever.

(Doc. 7-1 at 87).

submitted affidavits from the prosecuting attorney, Cook's attorney, the lead investigator, and a sergeant who also investigated Marshall Gill's murder. Each of the affidavits essentially refuted Cook's allegations, including his assertion that his testimony was coached, and that he was offered a plea deal or leniency.(Id.)

In its order denying Gill's Rule 32 petition, the trial court found that Gill's juror-misconduct claim was precluded because it had already been addressed at trial and on appeal. The court found with respect to Gill's remaining claims that:

> There is simply no credible evidence to support her arguments. The only evidence presented by Defendant is that of a three time convicted felon, Curtis Cook. His testimony at trial aligned completely with what he told investigators the night of and immediately after the murder and what he told his own wife prior to any police involvement. There is absolutely no evidence to show that there was any police misconduct or misconduct by the District Attorney or by the Defendant's own attorney. The newly discovered evidence is not credible and is unworthy of belief.

(Doc. 7 at 27-29).

On appeal, the Alabama Court of Criminal Appeals held that Gill's claim that in violation of Brady v. Maryland, 373 U.S. 83 (1963), the State had entered into a plea deal with Cook in exchange for his testimony, and subsequently covered it up, was barred because the issue had been raised and addressed on direct appeal. However, the appellate court went on to address the Cook affidavit in connection with Gill's claim that it constituted

newly discovered evidence which required her conviction be set
aside and that she be given a new trial. (Doc. 17-10).   In
rejecting Gill's appeal, the Alabama Court of Criminal Appeals,
stated in its memorandum opinion:

> Gill argues that this [Cook's] affidavit
> exonerates her and establishes that the State did in
> fact have a plea agreement with Cook prior to his
> testifying at her trial.  Although the Brady claim in
> her initial petition was precluded, Rule 32.2, Ala. R.
> Crim. P., does not prevent Gill from raising it as
> newly discovered evidence pursuant to Rule 32.1(e),
> Ala. R. Crim. P.  See Barbour v. State, 903 So. 2d at
> 868. . .

> The State submitted the affidavits of Shannon
> Lynch, the prosecuting attorney; Bruce Maddox, Curtis
> Cook's defense attorney; Captain Roy Freine, the lead
> investigator on the murder of Marshall Gill; and
> Sergeant Michael Granthum who also investigated the
> murder of Marshall Gill.  Each of these individuals
> essentially refuted Curtis Cook's allegations.

> Bruce Maddox, Cook's defense attorney, stated
> that Cook's version of the events leading to Marshall
> Gill's death did not match any of the information that
> he received during his representation of Cook.
> According to Maddox, he met with Cook several times
> prior to his testifying at Gill's trial in order to
> review his testimony.  Maddox further stated: "I had a
> typed version of my notes (because my handwriting is
> difficult for others to read) that I reviewed with Mr.
> Cook.  He made one potential correction which I wrote
> in by hand. . . . I never instructed Mr. Cook to 'get
> rid' of anything.'' (C. 326-27.)

> Shannon Lynch stated that she never had any
> contact with Curtis Cook during the investigation of
> the case until a week before Gill's trial.  Lynch
> stated that she met with Cook and his attorney in order
> to confirm that Cook's testimony was consistent with
> what the evidence in the case reflected.  According to
> Lynch, she only met with Cook one time and never
> pressured him to testify a certain way.  Lynch stated

that ''[a]t no time was any pressure applied or any promises made to Mr. Cook regarding this case." (C. 32 9.)

Both Captain Freine and Sergeant Granthum stated that they did not make any promises to Cook in exchange for his testimony. Freine stated that Cook initially denied involvement in the crime but, after speaking with his family, admitted his involvement in the murder. Freine further stated that the evidence collected during the investigation corroborated Cook's testimony at trial.

. . .

A review of the record from Gill v. State, (CR-08-0512, October 30, 2009) 64 So. 3d 1153 (Ala. Crim. App. 2009) (table), reveals that in addition to Cook's testimony at trial, Cook admitted on at least two previous occasions that he was paid by Vanessa Gill to assault her husband. Captain Freine testified that, when he interviewed Cook for the second time, Cook admitted that Gill paid him "to injure Mr. Gill's legs and try to blind him with some Red Devil Lye." (R2. 474.) Additionally, Cook's wife, Rachel Cook, testified that Curtis Cook called her from his cellular telephone while he was being chased by the police after the incident occurred. Mrs. Cook testified that her husband sounded scared and that she could hear the sirens in the background. She stated that "[Curtis] told me that he might have killed somebody and that he didn't mean to. . . . And later he told me that Vanessa [Gill] had paid him $5,000 to come to Selma that night and he was supposed to just beat Marshall up. And said he was supposed to break his legs with a bat." (R2. 501.) Since there was other testimony at trial corroborating Cook's testimony, we do not find Cook's post-trial recantation to be credible. Accordingly, Gill's newly-discovered-evidence claim is without merit and the circuit court did not err by denying it.

(Doc. 17-10 at 3, 5-8) (footnote omitted).

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. See Brady v. Maryland, 373

U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In <u>Napue v. Illinois</u>, 360 U.S. 264, 268-69, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) and <u>Giglio v. United States</u>, 405 U.S. 150, 153-54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the Supreme Court held that a defendant's right to a fair trial under the Fourteenth Amendment may be violated where the prosecution deliberately misleads a jury, or allows misleading testimony to go uncorrected, with respect to any promises offered a key prosecution witness in exchange for his testimony. A <u>Napue</u>/<u>Giglio</u> violation is a subset of a claim under <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), in which the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. at 87. "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Thus, in order to establish a <u>Brady</u> claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the

evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. See Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000); Luton v. Grandison, 44 F.3d 626, 628-29 (8th Cir. 1994); see also, Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); Moore v. Illinois, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972). Petitioner bears the burden of establishing each of these three elements. See Carter, 218 F.3d at 601.

As noted *supra*, while the state courts held that Gill's Brady claim was barred because it was raised and addressed on direct appeal, they did consider the Cook affidavit as newly discovered evidence, and evaluated it along with the other evidence of record. The appeals court concluded that the Cook affidavit was not credible.  Gill has not demonstrated that the state courts' factual finding was erroneous.  As determined by the trial court, Cook's trial testimony established that Gill orchestrated the fatal beating of her husband by Cook for compensation.  Cook's trial testimony was corroborated by his wife, who spoke to him by telephone immediately after the brutal beating, and before Cook had been questioned by police.  She testified that Cook told her that he had beaten the victim at the behest of Gill, and that days later, Gill offered to pay her to keep silent, and subsequently arranged for $500 to be given to her in a Walmart parking lot.

Additionally, Cook's attorney, the state prosecutors and

investigators provided affidavits which disputed Cook's claim that they coerced him into giving trial testimony that was favorable to the prosecution in exchange for a lighter sentence. For instance, Cook's attorney stated that he took notes of his discussions with Cook about the murder, that because his handwriting was bad, he had his notes typed, and that when he was reviewing them with Cook, Cook clarified some of the information he had recorded; thus, there were some handwritten changes. Cook's lawyer denied that there was any offer of a plea or of leniency.  Likewise, Cook's own parents  testified under oath during the hearing on Gill's motion for a new trial, and they too denied knowledge of any plea deal or leniency offered to Cook, and indicated that they believed Cook testified at trial because he desired to get things right [12] .  Against this backdrop of evidence, the state courts found that Cook's affidavit was simply not credible. This factual finding by the state court is accorded a presumption of correctness.  Gill has not shown that the decisions of the state courts were contrary to or involved an unreasonable application of clearly established federal law or that the decisions of those courts were based on an unreasonable determination of the facts in

---

[12] While Cook's affidavit asserted that he had at least three meetings with the prosecution and his attorney during which they coached him on his testimony, and that jail personnel could confirm the meetings, defense witness Beverly Huffman, a Dallas County Corrections Officer, testified at trial that she was aware of only one meeting at the jail between the prosecutor, Miss Shannon Lynch, and  Cook. (Doc. 7-1 at 755-56.)

light of the evidence presented in the state-court proceedings. Indeed, the Eleventh Circuit has observed that post-trial recantations should be viewed with "extreme suspicion". See United States v. Santiago, 837 F. 2d 1545, 1550 (11th Cir. 1988). Thus, Gill's claims five and seven are without merit.

**6. Claim Six.**

In count six, Gill argues that her conviction and sentence should be set aside due to newly discovered evidence, namely the Cook affidavit, which proves a due process violation, and that she is actually innocent of the charge for which she was convicted. (Doc. 7-1 at 55-58). For the reasons set forth above with respect to claims five and seven, Gill's due process claim is likewise without merit. Further, to the extent Gill is attempting to raise a free standing claim of actual innocence, this claim does not present a cognizable basis for federal habeas corpus relief. Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact. See Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). A claim of innocence is not itself a constitutional claim. Rather, it is a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. Schlup v. Delo, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). To satisfy Schlup, a petitioner must first "support [her] allegations

of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. The petitioner must then demonstrate that "it is more likely than not that no reasonable juror would have convicted [her] in light of the new evidence." Id. at 327. However, the fundamental miscarriage of justice exception is available only where the prisoner supplements her constitutional claim with a colorable showing of factual innocence. The Supreme Court has not held that it extends to freestanding claims of actual innocence.

Here, the exception is inapplicable because in claim six, Gill does not seek to excuse a procedural default so that she may bring a defaulted constitutional claim challenging her conviction. Instead, she appears to be seeking seeks habeas relief based on her claim that she is factually innocent of murder. She is not entitled to federal review of this claim. Further and alternatively, even if a free-standing actual innocence claim by a defendant not under sentence of death were cognizable, any such claim by Gill fails. To prevail on such a claim, she would have to meet an "extraordinarily high" standard. Herrera, 506 U.S. at 426. The petitioner must show new facts unquestionably establishing her innocence. Schlup, 513 U.S. at 317. Gill has provided no such evidence. As noted *supra*, Gill's innocence claim rests solely on the recanted affidavit of Cook. The state courts reviewed the

Cook affidavit, along with the other evidence of record, including Cook's trial testimony, and the testimony of his wife, and determined that the post-trial recantation was not credible. The Cook affidavit was not consistent with the trial evidence reflecting the weapon used and the nature of the injuries sustained by the victim, nor was it consistent with the testimony of Cook's wife nor Captain Freine, who both testified that Cook admitted to them the night of the murder that he was paid by Gill to assault her husband. Accordingly, the Cook affidavit falls way short of unquestionably establishing Gill's innocence. Thus, she is not entitled to habeas relief on this claim.

**III. Certificate of Appealability.**

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing 2254 Cases (December 1, 2009). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a habeas petition is dismissed on procedural grounds, without reaching the merits of any underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would

find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).  Where a habeas petition is being denied on the merits, of an underlying constitutional claim, as in this case, a certificate of appealability should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot [v. Estelle, 463 U.S. 880, 893, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)], includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (internal quotation marks omitted); accord Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).  In the instant action, Gill has failed to show that the state courts rendered decisions that were neither contrary to, nor an unreasonable applications of, clearly established federal law. See 28 U.S.C. § 2254(d)(1).

None of Gill's claims would warrant the issuance of a Certificate of Appealability in this case.  For the reasons discussed above, she has failed to establish that there was

51

insufficient evidence to convict, that the instructions to the jury and admissibility of photographs into evidence were unconstitutional, and has further failed to show that the jury was tampered with, that the prosecution failed to reveal a deal made with its main witness or failed to disclosed impeaching evidence. And, lastly, Petitioner has not presented credible evidence of actual innocence. Accordingly, the Court finds that the decision of the Alabama Court of Criminal Appeals was a reasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d)(2). Under the circumstances, reasonable jurists could not debate whether any of her claims should be resolved in a different manner or were adequate to deserve encouragement to proceed further on the merits. The recommendation that these claims be denied is based on the straightforward application of clear Circuit precedent, and no reasonable jurist could differ on the appropriate disposition of the claims on the record presented. It is thus recommended that the Court deny any request for a Certificate of Appealability.

**IV. Conclusion.**

Based on the foregoing, it is the recommendation of the undersigned Magistrate Judge that Gill's petition for habeas corpus relief be **denied**, that this action be dismissed, and that judgment be entered in favor of the Respondents, and against the Petitioner, Vanessa Gill. It is further recommended that any

motion for a Certificate of Appealability or for permission to appeal *in forma pauperis* be denied.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); **Fed.R.Civ.P.** 72(b); S.D. ALA GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." *11th Cir. R. 3-1.* In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or

refers to the briefing done by the Magistrate Judge is not specific.

**DONE** this **26**th day of **May, 2016.**

                              ____/s/ SONJA F. BIVINS____
                              **UNITED STATES MAGISTRATE JUDGE**